RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 26a0229p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

DEREK ANTOL,

                *Plaintiff-Appellant*,

    *v.*

ROBERT S. ENGLISH; RYAN DANGL; VICTORIA
BORDNER; ELIZABETH BOURGEOIS; JACOB LEWIS; MARK
KASSUBA; MICHAEL MCDONALD; SCOTT JOSEPHS;
LYNARD OLIVER; KEVIN KLOMPARENS; SCOTT GODAIR;
BRADLEY STIMAC; JONATHAN MEYER; KAYLIE BIRGY;
NICHOLAS RESZKA; SHELLY IZZARD; ED BRINKMAN;
TROOPER 1; JACOB CHOICE; TROOPER 2,

                *Defendants-Appellees*.

No. 25-2054

───────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:25-cv-00170—Robert J. Jonker, District Judge.

Argued: June 4, 2026

Decided and Filed: August 13, 2026

Before: MOORE, CLAY, and NALBANDIAN, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** J. Nicholas Bostic, Lansing, Michigan, for Appellant. Tyler R. Kitzmiller, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellees. **ON BRIEF:** J. Nicholas Bostic, Lansing, Michigan, for Appellant. Tyler R. Kitzmiller, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellees.

    CLAY, J., delivered the opinion of the court in which MOORE, J., concurred. NALBANDIAN, J. (pp. 17–21), delivered a separate opinion concurring in part and dissenting in part.

---

**OPINION**

---

CLAY, Circuit Judge.   Plaintiff Derek Antol filed this suit under 42 U.S.C. § 1983 against Defendant officers Robert English, Ryan Dangl, Victoria Bordner, Elizabeth Bourgeois, Jacob Lewis, Mark Kassuba, Michael McDonald, Scott Josephs, Lynard Oliver, Kevin Klomparens, Scott Godair, Bradley Stimac, Jonathan Meyer, Kaylie Birgy, Nicholas Reszka, Shelly Izzard, Ed Brinkman, and Jacob Choice.  Plaintiff claims that Defendant officers violated his Fourth Amendment right against unlawful searches when they executed a purportedly invalid search warrant on his residence in Muskegon County, Michigan.   Plaintiff also alleges that Defendant Josephs violated his Fourth Amendment right against unreasonable seizures and Fourteenth Amendment substantive due process rights when Defendant Josephs prevented Plaintiff from using his own restroom during the execution of the search warrant.  The district court granted qualified immunity to Defendants and dismissed Plaintiff's claims.  Plaintiff now appeals the dismissal of those claims.  For the reasons set forth below, we **AFFIRM** in part, **REVERSE** in part, and **REMAND** for proceedings consistent with this opinion.

## I.  BACKGROUND

### A.  Factual Background

Plaintiff Derek Antol is a resident of Muskegon County, Michigan and owns several residential and business properties.   One of Plaintiff's properties is the Deuces Wild Smoke Shop.  The shop ran a promotion wherein customers could purchase "a pipe and receive[] a gift of marijuana."  First Amended Complaint ("FAC"), R. 34, PageID #381 ¶ 113.c.  This promotion attracted the ire of the Michigan State Police's Marijuana and Tobacco Investigations Section West ("MTIW") team, which opened an investigation into the property on suspicion that it was operating without a proper Michigan state marijuana dispensary license.

In 2019, Officer Greenert of the MTIW visited Deuces Wild Smoke Shop while undercover to gather information about the business's promotions.  He asked an employee about the promotion and learned that between Thursday and Sunday the business sold "specific glass

pipes for $35 each." Affidavit, R. 20-2, PageID #157. In return, a customer would then pick "either 1/8 ounce of marijuana, 1/2 gram of liquid marijuana, or five marijuana gummies as a 'gift.'" *Id.* The employee told Officer Greenert that he could purchase up to 20 pipes at once for a total of 2.5 ounces of marijuana.

Armed with this information, Officer Greenert eventually returned to the business with another officer and purchased a single glass pipe. He received a receipt that showed that the business did not charge him any sales tax. After inquiring with the store clerk, he learned that the owners of the business supplied the marijuana. Following this inquiry, Officer Greenert chose his complimentary 1/8 ounce of marijuana.

Over the next three years, several MTIW undercover officers continued the investigation through multiple visits to the business. The officers repeatedly purchased a single glass pipe for $35 and received a complimentary 1/8 ounce of marijuana. During one visit, an officer visited on a Tuesday and inquired with the clerk as to whether he could still benefit from the glass pipe deal. The clerk told the officer that she had to ask "the owner," who was later identified as Plaintiff. Plaintiff told the clerk that she could proceed with the promotion and, after receiving thanks from the officer, told the officer that he should come back again. During another visit, undercover officers learned from the employees that the owner "was a caregiver" and that the marijuana supplied to the business was "their overages." A different visit yielded further information: an employee told undercover officers that "the owner grows marijuana approximately 20 miles away." *Id.* at PageID #160. MTIW officers eventually secured search warrants for Plaintiff's utility bills and the business's bank accounts. From these records, the officers determined that the business underreported its income on its 2018 and 2019 tax returns.

Defendant Officer Robert English memorialized these observations in an April 8, 2022 affidavit. Defendant English explained, based on his training, experience, and the prior observations, that he suspected Plaintiff engaged in growing marijuana unlawfully, tax evasion, and money laundering. He submitted the affidavit to a state magistrate to obtain a search warrant of Plaintiff's residential property at 1769 Green Creek Road in Muskegon County. Officers executed the search warrant around 8:00 AM on April 11, 2022. At the start of the search,

officers knocked on Plaintiff's front door and waited until he opened it. The officers then ordered him out of his house and handcuffed him. Soon after officers detained Plaintiff, an officer patted down Plaintiff and searched his pockets—ostensibly to ensure he was not armed. Plaintiff was barefoot and shirtless until an officer brought him a sweatshirt and boots five minutes later. Soon after, Plaintiff's then-wife and daughter were brought outside the residence without any restraints. Seven minutes into the search, officers brought Plaintiff into the residence for about forty seconds. Plaintiff's then-wife and daughter were also allowed back into the residence under the officers' supervision for approximately two minutes. Officers then took Plaintiff outside the residence and strolled him around Plaintiff's property before interviewing him in a police van. All the while, officers continued their search inside and outside of Plaintiff's residence.

After he was interviewed in the police van, Plaintiff requested to use his restroom in his house. Defendant Josephs, who is alleged to have been overseeing Plaintiff, denied his request and told Plaintiff that he would have to relieve himself in the front yard. After thirty more minutes and a few more denied requests, Plaintiff told Defendant Josephs that he felt "that he was basically being forced to commit indecent exposure," to which Defendant Josephs responded "something to the effect of 'what the f** are you going to do about it.'" FAC, R. 34, PageID #388 ¶¶ 157–60. Plaintiff then urinated in his own yard. About two minutes later, Defendant officers took Plaintiff inside his house and handcuffed him to a chair while they finished the search. Though the officers seized several items from Plaintiff's house, most were eventually returned to him months later. In total, the search allegedly lasted around six to seven hours.

Following this search and a subsequent search of Deuces Wild Smoke Shop, Plaintiff was charged with one count of maintaining a drug house, in violation of Michigan Compiled Laws § 333.7405(1)(d), and one count of possession of marijuana that was more than twice the amount of marijuana allowed by Michigan Compiled Laws § 333.27955, in violation of Michigan Compiled Laws § 333.27965(4). Plaintiff eventually pled guilty to the possession charge in exchange for dismissal of the maintenance of a drug house charge and faced no criminal fines or jail time.

## B.  Procedural History

Plaintiff filed this instant action in the Western District of Michigan, bringing Fourth Amendment unlawful search, excessive force, and Fourteenth Amendment substantive due process claims under 42 U.S.C. § 1983.  In his operative complaint, Plaintiff avers that Defendant officers Robert English, Ryan Dangl, Victoria Bordner, Elizabeth Bourgeois, Jacob Lewis, Mark Kassuba, Michael McDonald, Scott Josephs, Lynard Oliver, Kevin Klomparens, Scott Godair, Bradley Stimac, Jonathan Meyer, Kaylie Birgy, Nicholas Reszka, Shelly Izzard, Ed Brinkman, and Jacob Choice, violated his constitutional rights by executing a search on his personal property without a purportedly valid warrant.  Plaintiff next alleges that Defendant Josephs' refusal to allow Plaintiff to use his restroom while detained during the search constituted excessive force under the Fourth Amendment.  Finally, Plaintiff claims that Defendant Josephs' actions also violated his Fourteenth Amendment substantive due process rights.

Defendants moved to dismiss Plaintiff's § 1983 claims, arguing that Plaintiff failed to adequately plead his claims and that Defendants were entitled to qualified immunity.  The district court granted Defendants' motion to dismiss, finding that Defendants were entitled to qualified immunity because Plaintiff failed to sufficiently allege his § 1983 unreasonable search, excessive force, and due process claims.  In the alternative, the district court further held that Plaintiff's § 1983 due process claims would fail because the alleged constitutional rights violations at issue were not clearly established.  Plaintiff's timely appeal followed.[1]

## II.  DISCUSSION

## A.  Standard of Review

"We review de novo a district court's grant of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) on qualified-immunity grounds."  *Chrestman ex rel. Wooden v. Metro.*

---

[1]On appeal, Plaintiff filed a motion for judicial notice of an aerial photograph of his residence that was searched by Defendants.  Dkt. 22.  Pursuant to Federal Rule of Appellate Procedure 10(a)(1), this photograph is already part of the record on appeal since Plaintiff included it as an exhibit in his response to Defendants' first motion to dismiss.  Accordingly, Plaintiff's motion is denied.

*Gov't of Nashville & Davidson Cnty.*, 156 F.4th 694, 700 (6th Cir. 2025). We thus ask whether Plaintiff has stated a plausible claim in his complaint. *VCST Int'l B.V. v. BorgWarner Noblesville, LLC*, 142 F.4th 393, 401 (6th Cir. 2025). We "also accept [the] complaint's factual allegations as true and consider only the outside-the-complaint evidence that the complaint refers to and depends on." *Id.* "We 'must reverse the district court's dismissal unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Warman v. Mount St. Joseph Univ.*, 144 F.4th 880, 888 (6th Cir. 2025) (quoting *Meriwether v. Hartop*, 992 F.3d 492, 498 (6th Cir. 2021)).

## B. Analysis

We review claims for qualified immunity under a two-step analysis. *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010). "First, we consider whether '[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right.'" *Id.* (quoting *Scott v. Harris*, 550 U.S. 372, 377 (2007)). "If the answer is yes, we next ask 'whether the right was clearly established . . . in light of the specific context of the case.'" *Id.* (quoting *Scott*, 550 U.S. at 377). A right is clearly established only if "'existing precedent [has] placed the statutory or constitutional question beyond debate,' although we do not require 'a case directly on point.'" *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 275 (6th Cir. 2020) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). "While the sequence of this two-step inquiry is often appropriate, it is no longer mandatory." *Binay*, 601 F.3d at 647 (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

### 1. The Search Warrant was Sufficiently Supported by Probable Cause

Plaintiff first alleges that Defendants conducted an unlawful search of his residential property because they executed a purportedly invalid search warrant. Plaintiff contests some, but not every, detail listed in Defendant English's affidavit to challenge the validity of the warrant.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "[A] search warrant may be issued only 'upon probable cause, supported by Oath or affirmation,

and particularly describing the place to be searched, and the . . . things to be seized.'" *Tlapanco v. Elges*, 969 F.3d 638, 648 (6th Cir. 2020) (quoting U.S. Const. amend. IV.). "Probable cause exists if the facts and circumstances are such that a reasonably prudent person would be warranted in believing that an offense had been committed and that evidence thereof would be found on the premises to be searched." *Id.* (quoting *Peffer v. Stephens*, 880 F.3d 256, 263 (6th Cir. 2018) (citation modified). A jury determines whether probable cause exists unless the jury could come to only one "reasonable determination." *Id.* at 649 (citing *Yancey v. Carroll Cnty.*, 876 F.2d 1238, 1243 (6th Cir. 1989)).

Typically, "police officers are entitled to rely on a judicially secured warrant for immunity from a § 1983 action for illegal search and seizure unless the warrant is so lacking in indicia of probable cause, that official belief in the existence of probable cause is unreasonable." *Id.* (quoting *Yancey*, 876 F.2d at 1243). "But [this] principle yields when an officer deliberately or recklessly makes material false representations in the warrant affidavit." *Chancellor v. Geelhood*, 168 F.4th 388, 394 (6th Cir. 2026). "A plaintiff, thus, may challenge an officer's qualified immunity defense in a civil rights case by showing that (1) the officer's warrant affidavit contained a false statement or omission that was made either deliberately or with reckless disregard for the truth; and (2) the false statement or omission was material to the finding of probable cause." *Tlapanco*, 969 F.3d at 649. "If the affidavit contains false statements or material omissions, we set aside the statements and include the information omitted in order to determine whether the affidavit is still sufficient to establish probable cause." *Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010).

Plaintiff delineates several purported false, misleading, or omitted statements in Defendant English's affidavit. First, Plaintiff avers that the affidavit falsely claims that Officer Greenert was provided information from a local narcotics team that Deuce Wild Smoke Shop illegally sold marijuana. Second, Plaintiff claims that the affidavit falsely claims that Deuces Wild Smoke Shop was jointly owned by Plaintiff, his then-wife, and a person named Robert Holm, where it was actually solely owned by Plaintiff. Plaintiff also asserts that the affidavit falsely claims that he did not own a medical marijuana card. Third, Plaintiff claims that the affidavit mistakenly claims that Plaintiff's employee asked Plaintiff if she could sell an

undercover agent marijuana where she instead asked if she could sell the agent a pipe.  Fourth, Plaintiff claims that the affidavit falsely asserted a retail value for the pipes.  Fifth, Plaintiff generally claims that the affidavit could not support the inferences that Plaintiff was not charging sales tax on his merchandise, Plaintiff had a security measure in place to prevent customers from handling the marijuana, Plaintiff knew that he was selling marijuana, Plaintiff was underreporting his taxable income, and Plaintiff mislead his banks and financial institutions by failing to disclose that he was running a business selling marijuana.  And finally, Plaintiff claims that the affidavit was misleading because it did not reference all of Plaintiff's financial records and tax payments in 2018 to 2019.

Even when we excise these allegedly false statements from the affidavit and include the alleged omissions, the affidavit still provides the requisite probable cause to justify a search warrant of Plaintiff's residence for a potential illegal marijuana growth operation.  Plaintiff does not contest, in fact he agrees, that the affidavit correctly identifies himself as the owner of the Deuces Wild Smoke Shop.  He also does not contest the officers' observations that the business provided complimentary marijuana to customers who purchased glass pipes.  Nor does Plaintiff challenge Defendant English's conclusion, based on his training and experience, that "caregivers and subjects who illegally grow marijuana often grow and cultivate the marijuana on their own property either in their residence or outbuildings such as barns."  Affidavit, R. 20-2, PageID #160.  And though Plaintiff claims he had a medical marijuana card, he does not contest the assertions that Plaintiff's employees identified Plaintiff as the owner, his employees told the officers that the owner of the business grew marijuana at a location twenty miles away and supplied the business with its "overages," and officers properly identified his personal residence.  *Id.* at PageID #159–60.  At best, the allegedly false statements and omissions materially undercut probable cause only as to Plaintiff's suspected tax evasion or money laundering.  These unchallenged facts suffice to establish probable cause that Plaintiff kept or maintained a "dwelling" or "building" "that is used for keeping or selling controlled substances," in violation of Michigan Compiled Laws § 333.7405(1)(d).  The warrant was thus still properly issued on the suspicion that Plaintiff operated an illegal marijuana growth operation on his residence.  Accordingly, the Defendant officers are entitled to qualified immunity because the search

warrant was otherwise sufficiently justified by probable cause. *See Sykes*, 625 F.3d at 305. The district court thus did not err when it concluded the same.

### 2. The District Court Erred in Holding that Plaintiff Did Not Sufficiently Plead a Violation of His Fourth Amendment Right Against Unreasonable Seizures

Plaintiff claims Defendant Josephs violated his Fourth Amendment right to be free from excessive force or unreasonable seizure when he refused Plaintiff's request to use his own restroom while Plaintiff was detained during the search. Because Defendant Josephs refused Plaintiff's request, Plaintiff was forced to urinate in his front yard. Plaintiff argues under excessive force and unreasonable seizure theories.

### a. Constitutional Right Violation

The Fourth Amendment protects the people "against unreasonable searches and seizures." U.S. Const. amend. IV. "A 'seizure' triggering the Fourth Amendment's protections occurs only when government actors have, 'by means of physical force or show of authority, . . . in some way restrained the liberty of a citizen.'" *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)). "[D]uring the execution of a search warrant for contraband, police officers have the 'limited authority to detain the occupants of the premises while a proper search is conducted.'" *United States v. Binford*, 818 F.3d 261, 268 (6th Cir. 2016) (quoting *Michigan v. Summers*, 452 U.S. 692, 705 (1981)). "Inherent in [this] authorization to detain an occupant of the place to be searched is the authority to use reasonable force to effectuate the detention." *Binay*, 601 F.3d at 648 (quoting *Muehler v. Mena*, 544 U.S. 93, 98 (2005)). Nonetheless, "[a]n officer's use of excessive force violates the Fourth Amendment's protection against unreasonable seizures." *Romero v. City of Lansing*, 159 F.4th 1002, 1008–09 (6th Cir. 2025) (citing *Graham*, 490 U.S. at 394–95).

We evaluate a § 1983 Fourth Amendment excessive force claim under an objective reasonableness test, "looking to the reasonableness of the force in light of the totality of the circumstances confronting the defendants, and not to the underlying intent or motivation of the defendants." *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013). "We balance 'the nature

and quality of the intrusion on [a plaintiff's] Fourth Amendment interests against the countervailing governmental interests at stake.'" *Id.* (quoting *Ciminillo v. Streicher*, 434 F.3d 461, 466–67 (6th Cir. 2006)). Three factors guide this analysis: "(1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 472–73 (quoting *Martin v. City of Broadview Heights*, 712 F.3d 951, 958 (6th Cir. 2013)) (citation modified). We evaluate these factors "from the perspective of a reasonable officer on the scene making a split-second judgment under tense, uncertain, and rapidly evolving circumstances without the advantage of 20/20 hindsight." *Id.* at 473 (citing *Graham*, 490 U.S. at 396–97). Though these factors are instructive, they "are not exhaustive, and our inquiry remains whether the totality of the circumstances justified defendant's particular seizure of plaintiff." *Vanderhoef v. Dixon*, 938 F.3d 271, 276–77 (6th Cir. 2019).

We may also evaluate Plaintiff's excessive force claim under the general Fourth Amendment unreasonable seizure framework. After all, "[a] seizure can be 'unreasonable' for any number of reasons[.]" *Boone v. Spurgess*, 385 F.3d 923, 933 (6th Cir. 2004); *see also Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 595–96 (7th Cir. 1997). Regardless of how we view Plaintiff's Fourth Amendment claim, we apply the same objective reasonableness standard to Plaintiff's detention during the search warrant's execution. *See Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985) (utilizing a "totality of the circumstances" test to analyze "a particular sort of search or seizure"); *Burgess*, 735 F.3d at 472 ("Under the Fourth Amendment, we apply an objective reasonableness test, looking to the reasonableness of the force in light of the totality of the circumstances confronting the defendants, and not to the underlying intent or motivation of the defendants."); *see also Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994) ("[W]hile detentions of occupants during the period of a search will under most circumstances prove to have been reasonable, a detention may be unreasonable in a particular instance either because the detention itself is improper or because it is carried out in an unreasonable manner.").

In light of totality of the circumstances of this case, we thus ask whether Plaintiff has plausibly alleged that Defendant Josephs' repeated refusal of Plaintiff's requests to use his own restroom rendered Plaintiff's seizure unreasonable under the Fourth Amendment. Though we

are not limited to the *Graham* factors we use typically to evaluate a Fourth Amendment excessive force claim, discussion of those factors is instructive. Based on the following, we find that Plaintiff has plausibly plead a § 1983 Fourth Amendment unreasonable seizure claim.

We start with the first *Graham* factor, the severity of the crime at issue. *Burgess*, 735 F.3d at 472–73. Plaintiff was investigated for suspicion of illegally growing or distributing marijuana from his residence. Narcotic trafficking is a serious crime and, in some instances, marijuana trafficking is viewed as a serious drug offense. *See In re Sargent*, 837 F.3d 675, 677 (6th Cir. 2016) (noting a defendant's 18 U.S.C. § 922(g) marijuana trafficking conviction of more than five pounds of marijuana was a serious drug offense under the Armed Career Criminal Act). So this factor might weigh in favor of at least a limited detention during the course of the search.

We next consider whether Plaintiff posed an immediate threat to Defendant Josephs' safety or to others. *Burgess*, 735 F.3d at 472–73. Plaintiff alleges that he was generally compliant with the officers' commands: He opened his front door after the officers knocked, exited the house upon command, and was handcuffed. Plaintiff only failed to comply with Defendants' command to "get on the ground," but he was nonetheless restrained without incident. FAC, R. 34, PageID #387 ¶¶ 146–47. Plaintiff was also shirtless and barefoot when he was handcuffed and he was patted down by an officer; thus, it should have been clear to officers that he was unarmed. Plaintiff alleges that eighteen officers were present for the search, so Defendant Josephs easily could have requested assistance with monitoring Plaintiff while he used the restroom. In light of these circumstances, Defendant Josephs' denial of Plaintiff's request to use the restroom was not necessary to maintain the Defendant officers' safety.

Finally, we consider whether Plaintiff was actively resisting arrest or attempting to evade arrest by flight. *Burgess*, 735 F.3d at 472–73. The factual allegations demonstrate that Plaintiff made no such resistance or attempts to evade arrest. Indeed, Plaintiff's desire to use his own restroom in the building the other Defendant officers were actively searching is the exact opposite of evading arrest. This factor thus counsels against finding that refusing Plaintiff's request was a necessary use of force.

The *Graham* factors thus suggest that only minimal force was necessary and Defendant Josephs may have used too much force when he refused Plaintiff's requests to use the restroom and instructed him to urinate outside in public view. To be sure, law enforcement officers rightly may be concerned with detained suspects interfering with a search if they are allowed to go back inside the house and potentially destroy evidence. *See Bailey v. United States*, 568 U.S. 186, 197–98 (2013). Nonetheless, the context underlying Plaintiff's claim and the scope of the search in the instant case belies this concern. Plaintiff was not requesting unfettered access to his home but was simply asking for a quick opportunity to use his own bathroom and could be monitored to avoid any risk to the officers or the investigation. Further, the search warrant delineated "unlicensed marijuana grow," "personal files, folders, cabinets, journals, books, notes, papers," and "suspected marijuana or marijuana derived substances," among others, as items to be searched and seized from Plaintiff's residence. Affidavit, R. 20-2, PageID #156. Defendant officers thus likely expected to find a meaningful homegrown marijuana operation on the property, based on Defendant English's training and experience that "caregivers and subjects who illegally grow marijuana often grow and cultivate the marijuana on their own property either in their residence or outbuildings such as barns." *Id.* at PageID #160. It is therefore difficult to see how Plaintiff, who was handcuffed and under the custody and supervision of eighteen investigating officers, could have interfered with the search or destroyed evidence if he was allowed to use his own restroom under any of the Defendant officers' supervision.

The nature of the seizure also undercuts the officers' general concern as to interference and potential destruction of evidence. Dash camera footage demonstrates that, seven minutes into the search, officers brought Plaintiff into his residence for about forty seconds. The footage also shows that Plaintiff's then-wife and daughter were allowed back into the residence under the officers' supervision for approximately two minutes. Plaintiff also alleges that Defendants brought Plaintiff back into his home and handcuffed him to a chair soon after he urinated, further demonstrating that Plaintiff's mere presence in his home was not a serious impediment to the search. Any claim to the contrary appears to be pretextual. These facts and allegations suggest that Defendant Josephs did not use "the least intrusive means reasonably available" when he

denied Plaintiff's requests to use his bathroom. *Griffith v. Coburn*, 473 F.3d 650, 658 (6th Cir. 2007).

Thus, we cannot conclude at this early stage of the case "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Warman*, 144 F.4th at 888 (quoting *Meriwether*, 992 F.3d at 498). The district court erred when it concluded that Plaintiff did not sufficiently allege a § 1983 Fourth Amendment unreasonable seizure claim against Defendant Josephs.

### b. *Clearly Established Law*

Though Plaintiff has alleged a constitutional rights violation, he must still show that his right to use a restroom upon his urgent request while detained was clearly established at the time of the violation. *See Binay*, 601 F.3d at 646–47 ("For a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."). As discussed, "[a] right is clearly established for purposes of overcoming the qualified immunity defense only when 'existing precedent [has] placed the statutory or constitutional question beyond debate,' although we do not require 'a case directly on point.'" *Ouza*, 969 F.3d at 275 (quoting *al-Kidd*, 563 U.S. at 741). Plaintiff "bears the burden of showing that an officer is not entitled to qualified immunity." *Schulkers v. Kammer*, 955 F.3d 520, 533 (6th Cir. 2020). Relatedly, "where the violation was sufficiently 'obvious' under the general standards of constitutional care[,] . . . the plaintiff need not show 'a body' of 'materially similar' case law" to demonstrate a clearly established right. *Lyons v. City of Xenia*, 417 F.3d 565, 579 (6th Cir. 2005) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)).

This case presents an "obvious" case where Plaintiff need not rely on a case on point to demonstrate that any reasonable officer would have known that denying Plaintiff the ability to use a restroom under these factual circumstances violated his Fourth Amendment right against unreasonable seizures. *See District of Columbia v. Wesby*, 583 U.S. 48, 65 (2018). As discussed, by the time Plaintiff made his requests to Defendant Josephs, Defendant officers had already patted down Plaintiff, allowed him back into his residence for 40 seconds, allowed his then-wife and daughter back into the residence for two minutes, and continued to search his

residence for approximately 30 minutes.  Dash camera footage reveals that two to three officers were able to watch over Plaintiff's then-wife and their daughter right outside the front door of the residence for approximately nine minutes before officers brought the pair back into the residence for at least another 30 minutes.  The search went so much without incident that two officers can be seen on dash camera footage chatting in front of the residence for about 16 minutes.  Despite all this, Defendant Josephs allegedly cursed at Plaintiff when he asked to use his own restroom and expressed his concerns that he would have to expose himself if forced to urinate in his front yard.  And to further confound Defendant Josephs' purported reasoning in this case, Plaintiff alleges that he was brought back into his residence just two minutes after he urinated in his yard and was handcuffed to a chair for the remainder of the search.

Against this factual backdrop and construing the facts in the light most favorable to Plaintiff, any reasonable officer in Defendant Josephs' position would have realized that allowing Plaintiff to use his restroom while supervised would not have jeopardized the search at all.  The unlawfulness of the denial thus should have been obvious to Defendant Josephs.  Accordingly, we conclude that Plaintiff pleaded a violation of his Fourth Amendment right against unreasonable seizures that was sufficiently obvious as a constitutional rights violation— insofar as such a violation pertains to the rights of privacy and human decency.  The district court therefore erred when it concluded that Plaintiff did not allege a violation of a clearly established right.

### 3.  Plaintiff's Fourteenth Amendment Claim

Plaintiff argues in the alternative that Defendant Josephs' refusal to allow him to use his own restroom also violated his Fourteenth Amendment substantive due process rights.  Plaintiff, however, relies on the same conduct as his Fourth Amendment unreasonable seizure claim.  This and Plaintiff's status as a free individual at the time of his seizure guides our analysis.

"Excessive force claims . . . can be raised under the Fourth, Eighth, and Fourteenth Amendments." *Burgess*, 735 F.3d at 472.  "Which amendment should be applied depends on the status of the plaintiff at the time of the incident; that is, whether the plaintiff was a free citizen, convicted prisoner, or fit in some gray area in between the two." *Id.*  As relevant to Plaintiff's

claim, we have said that "[t]he Fourteenth Amendment is the source of a pretrial detainee's excessive force claim because when a plaintiff is not in a situation where his rights are governed by the particular provisions of the Fourth or Eighth Amendments, the more generally applicable Due Process Clause of the Fourteenth Amendment provides the individual with protection against physical abuse by officials." *Lanman v. Hinson*, 529 F.3d 673, 680–81 (6th Cir. 2008). Indeed, "if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997).

Plaintiff's § 1983 Fourteenth Amendment claim, as presently alleged, merges with his Fourth Amendment unreasonable seizure claim. As discussed, Plaintiff alleges Defendants used force which "occurred in the course of an arrest or other seizure" and while he "was a free person." *Lanman*, 529 F.3d at 680; *see also Boone*, 385 F.3d at 933 ("In this circuit, a 'seizure' under the Fourth Amendment continues at least 'throughout the time the person remains in the custody of the arresting officers.'" (quoting *Johnson v. City of Cincinnati*, 310 F.3d 484, 492 (6th Cir. 2002)). Plaintiff also concedes on appeal that "[t]he conduct of [Defendant Josephs] that is at issue in the alternative [§ 1983 Fourteenth Amendment claim] is identical to the conduct at issue for [the § 1983 Fourth Amendment unreasonable seizure claim]." Plaintiff's Br. at 55. Thus, "the Fourth Amendment, rather than the 'more generalized notion of substantive due process' governs" Plaintiff's claim in this case. *Saalim v. Walmart, Inc.*, 97 F.4th 995, 1010 (6th Cir. 2024) (quoting *Graham*, 490 U.S. at 395); *see Lanman*, 529 F.3d at 680–81. The district court therefore did not err when it concluded that Plaintiff's § 1983 Fourteenth Amendment claim was "substantively identical" to Plaintiff's § 1983 Fourth Amendment claim and consequently dismissed it for being duplicative of his § 1983 Fourth Amendment unreasonable seizure claim. Order, R. 43, PageID #527–28; *cf. Brandenburg v. Hous. Auth. of Irvine*, 253 F.3d 891, 900 (6th Cir. 2001) (affirming district court's grant of summary judgment against a plaintiff's substantive due process claim for being duplicative of her First Amendment retaliation claim).

## III.  CONCLUSION

For the reasons set forth above, we **AFFIRM** the district court's dismissal of Plaintiff's § 1983 Fourth Amendment unlawful search claims against all Defendants based on Plaintiff's contention that the search warrant affidavit was defective and § 1983 Fourteenth Amendment substantive due process claim against Defendant Josephs, **REVERSE** the district court's dismissal of Plaintiff's § 1983 Fourth Amendment unreasonable seizure claim against Defendant Josephs, and **REMAND** to the district court for proceedings consistent with this opinion.

---

**CONCURRENCE / DISSENT**

---

NALBANDIAN, Circuit Judge, concurring in part and dissenting in part.  When you've got to go, you've got to go.  And here, Antol had to go.  But it wasn't a great time because the cops were searching his house at the time and say it wouldn't have been safe to let him back into the house to pee.  So Antol peed in his front yard.  And he's understandably upset about it, especially because the cops' excuse seems at least a little contrived.  But the question is whether what happened amounts to a constitutional violation.  Because I answer that question no, I dissent from that part of the majority opinion.

Did Officer Josephs violate Antol's Fourth Amendment rights by requiring him to urinate outside?  To answer that question, we first look to the amendment's original meaning,[1] informed by founding-era law and pre-founding English common law.  *Virginia v. Moore*, 553 U.S. 164, 168 (2008) (courts should "look to the statutes and common law of the founding era to determine the norms that the Fourth Amendment was meant to preserve"); *see also Wilson v. Arkansas*, 514 U.S. 927, 931 (1995) (Fourth Amendment analysis "may be guided by the meaning ascribed to it by the Framers"); *Atwater v. City of Lago Vista*, 532 U.S. 318, 327 (2001) ("pre-founding English common law" can shed light on original meaning).  If that inquiry proves inconclusive, we consider "traditional standards of reasonableness" by "balancing an individual's privacy interests against legitimate governmental interests." *Wyoming v. Houghton*, 526 U.S. 295, 299–300 (1999).  Here, both pre-founding English common law and founding-era precedent suggest that an officer conducting a lawful search could've removed an occupant from his home and kept him there over objection.  Because the majority didn't consider original meaning in concluding

---

[1]As I'll explain, the historical inquiry suggests that Officer Josephs didn't violate Antol's constitutional rights.  So there's little reason to evaluate the seizure "under traditional standards of reasonableness." *Wyoming v. Houghton*, 526 U.S. 295, 299–300 (1999).  But the majority did the opposite.  It conducted a general reasonableness analysis without first considering original meaning.  It also considered Antol's excessive-force theory under *Graham v. Connor*, 490 U.S. 386 (1989).  But excessive force doesn't map onto these facts.  Officer Josephs didn't apply any physical force on Antol.  The physical force that caused Antol's discomfort was fleeting and came from within his body—and only because he didn't urinate outside right away.

otherwise under a general reasonableness standard, I respectfully dissent as to that portion of its opinion.

First, although at common law a man's house is "his castle of defense and asylum," 3 William Blackstone, Commentaries *288, that principle yielded to the lawful execution of a warrant. Pre-founding common law established that no occupant of a house (or any citizen) could "disturb the King's officer, who [came] to execute the [King's] process." *Semayne's Case*, 77 Eng. Rep. 194, 198 (K.B. 1604). Specifically, English courts recognized that a "person who flies to his house" may not "prevent a lawful execution" of a search because in those circumstances, the "liberty or privilege of a house doth not hold against the King." *Id.* at 197–98; *see also* 4 Blackstone, Commentaries *129 (obstructing "the execution of lawful process" is "at all times an offence of a very high and presumptuous nature; but more particularly so, when it is an obstruction of arrest upon criminal process"). And if the occupant "had notice" of the search," "it [was] to be presumed that he would obey it." *Semayne's Case*, 77 Eng. Rep. at 196.

Indeed, under founding-era law, officers executing a warrant could control occupants to effectuate the search. Why? Because that lesser power inheres in a greater one: An officer conducting a search—in the paradigmatic case, for stolen goods—may "attach the goods, and the party in whose custody they are found, and bring them before [a justice] to give an account how he came by them." James Parker, Conductor Generalis 384 (1788); *see* William Waller Hening, The New Virginia Justice 403 (1795) (search warrants "ought to command that the goods found together with the party in whose custody they are found, be brought before some justice of the peace"); *see also Bell v. Clapp*, 10 Johns. 263, 265 (N.Y. 1813) (applying pre-founding English law to articulate an officer's *duty*, during the search, to "arrest[] any person in possession of the stolen goods at the place designated" and carry them away "without any directions in the warrant"). So founding-era law contemplated restraining then *removing* even innocent occupants during a lawful search.

So the common law "in place at the Constitution's founding," *Lange v. California*, 594 U.S. 295, 309 (2021), left little room for occupants to interfere with a search by moseying about their dwellings. And modern Fourth Amendment law incorporates these well-established principles. *See, e.g.*, *Bailey v. United States*, 568 U.S. 186, 197 (2013) ("If occupants are

permitted to wander around the premises, there is the potential for interference with the execution of the search warrant."); *Michigan v. Summers*, 452 U.S. 692, 703 (1981) ("The existence of a search warrant . . . provides an objective justification for the detention.").[2]

Nevertheless, even if police can generally restrain a dwelling's occupant during a lawful search, what if they're forcing him to commit a crime, like indecent exposure—does that change the analysis? Perhaps, but I think that an officer requiring an occupant to urinate outside during a search didn't amount to indecent exposure at common law—so it likely didn't violate the Fourth Amendment. Thus, Antol's theory that Officer Josephs violated his Fourth Amendment rights by forcing him to expose himself falls short.[3] At common law, indecent exposure required more than discreet urination. In *Sedley's Case*—the principal English indecent-exposure case— the defendant exposed himself to a large crowd from a balcony, urinated in bottles, and threw them at the crowd. 1 Keb. 620, 1 Siderf. 168 (1663). And Blackstone cited *Sedley's Case* to explain that the offense of "open and notorious lewdness" required "some grossly scandalous and public indecency." 4 Blackstone, Commentaries *64 (citing 1 Siderf. 168). So indecent exposure required a lewd act "actually . . . seen by more than one nonconsenting person." *See*

---

[2]The majority mentions only the potential destruction of evidence—then concludes that *Bailey* doesn't apply because "scope of the search belies this concern." Putting aside that a detainee can flush "journals, books, notes, [and] papers," R.20-2, Affidavit, PageID 156, down the toilet, *Bailey* isn't limited to the destruction of evidence. Rather, it reiterates the broader principle—understood at the founding—that a detainee can "interfere[]" with a search through a variety of ways, such as "seek[ing] to distract the officers" or by "simply get[ting] in the way." 568 U.S. at 197.

[3]Although current Michigan law doesn't shed light on "the norms that the Fourth Amendment was meant to preserve," *Moore*, 553 U.S. at 168, Antol likely didn't violate Michigan law by urinating outside in these narrow circumstances. Michigan law prohibits knowing "open or indecent exposure of [one's] person." Mich. Comp. Laws § 750.335a(1). That statute "envisages a combination of 2 things: a reasonably inferable indecent intention by the exposer as well as a reasonably-to-be-expected reaction of shock and shame on the part of the probable exposee." *People v. Hildabridle*, 92 N.W.2d 6, 18 (Mich. 1958) (Voelker, J.) (plurality opinion); *see also People v. Neal*, 702 N.W.2d 696, 699 (Mich. 2005) (per curiam) (the statute focuses "on the act of intentionally exposing oneself to others who would be expected to be shocked by the display" (citing *Hildabridle*, 92 N.W.2d 6)). To be sure, exposure needn't occur in public to be criminal. *Neal*, 702 N.W.2d at 698. Nor does the statute require a witness if the exposure "occurred in a public place under circumstances in which another person might reasonably have been expected to observe it." *Id.* at 700 (citing *People v. Vronko*, 579 N.W.2d 138 (Mich. Ct. App. 1998) (per curiam)). But even assuming, dubiously, that Antol's secluded yard is a public place (in which case there's no witness requirement), or it isn't a public place but Officer Josephs was the witness (equally dubious because he directed the conduct, *see generally Hildabridle*, 92 N.W.2d at 19, Antol's conduct didn't violate the statute. Discreet urination to relieve an urgent need, as directed by a police officer, doesn't establish any indecent intent on Antol's part. In any event, a conviction would run afoul of the Due Process Clause because Officer Josephs directed Antol's conduct. *See Raley v. Ohio*, 360 U.S. 423, 442 (1959); *Cox v. Louisiana*, 379 U.S. 559, 571 (1965).

Ronald Hamowy, *Medicine and the Crimination of Sin: "Self-Abuse" in 19th Century America*, 1 J. Libertarian Stud. 229, 230 (1977) (describing the early common-law approach).

That common-law understanding suggests that Officer Josephs' conduct didn't violate the Fourth Amendment as originally understood. And it informs the Fourth Amendment analysis in two ways.

First, it bears on "the norms that the Fourth Amendment was meant to preserve." *Moore*, 553 U.S. at 168; *see Houghton*, 526 U.S. at 299 ("[W]e inquire first whether the action was regarded as an unlawful search or seizure under the common law when the Amendment was framed."). Under founding-era law, an officer could detain, sequester, or remove occupants to facilitate a lawful search. And current Fourth Amendment law reflects that broad principle— which isn't limited to a destruction-of-evidence rationale. Nor did discreet urination meaningfully implicate founding-era privacy norms, although that's admittedly a closer question.

And second, founding-era law afforded no remedy for Officer Josephs' conduct—which also suggests that the conduct was reasonable on an original understanding of the Fourth Amendment. The common law linked torts and crimes under generally applicable law, like trespass, to liability for officers executing a search. So an officer was liable for trespass if, for example, he used unnecessary force to break a door, *Semayne's Case*, 77 Eng. Rep. at 196, or rifled through private effects for hours without justification, *Entick v. Carrington*, 95 Eng. Rep. 807 (K.B. 1765). But because discreet urination didn't amount to indecent exposure at common law, Antol didn't commit a common-law crime or tort. Necessarily, then, Officer Josephs didn't force him to commit one. Antol had no remedy because Officer Josephs didn't violate the law or force him to do so—regardless of whether his actions were privileged by a lawful warrant. That Antol had no remedy at common law suggests that the seizure was reasonable.

But regardless of the outcome, the majority's methodology is flawed. It relies on "reasonableness" and nebulous "rights of privacy and human decency," and it fails to consider original meaning. Because we have an obligation to ascertain the original meaning of the Fourth

Amendment in deciding whether Officer Josephs violated Antol's constitutional rights, I respectfully dissent.**4**

---

**4**I note, as I've done before, that my analysis is subject to a later, more detailed or different historical analysis. This is particularly true when the parties have provided no help. *See, e.g.*, *United States v. Whiteside*, 141 F.4th 734, 745 n.4 (6th Cir. 2025). But in this case, I am, at a minimum, convinced that the rule that Antol asks us to recognize is not clearly established.